UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KESIA WOODS,

        Plaintiff,

v.                              CAUSE NO. 3:23-CV-1007 DRL

KEYSTONE RV COMPANY,

        Defendant.

## OPINION AND ORDER

Following her termination from Keystone RV Company, Kesia Woods filed a charge of discrimination with the Equal Opportunity Employment Commission and then this suit. She says Keystone permitted a hostile work environment and failed to accommodate her after a workplace injury. She brings a sex discrimination claim under Title VII of the 1964 Civil Rights Act and a failure to accommodate claim under the Americans with Disabilities Act (ADA). Keystone requests summary judgment on both claims. The court grants the motion.

## BACKGROUND

The summary judgment record establishes the following facts, as viewed in the light most favorable to the nonmovant. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). Keystone manufactures towable recreational vehicles [33-1 ¶ 2]. Ms. Woods began working at the Keystone plant on August 31, 2021; her husband, Chad Woods, had been an employee there eleven years [33-5 Tr. 10]. She worked as a receiver, and her job consisted of tarping the vehicles and cleaning

(what her supervisor referred to as "constant physical work") [*id.* Tr. 11; 33-6 Tr. 23].[1] When she started work, Ms. Woods received Keystone's employee handbook and certified that she had read it [33-1 ¶ 4; 33-2]. The handbook contained policies on attendance, disability accommodation, and harassment [33-1 ¶ 3; 33-4].

Marshall Minnick directly supervised Ms. Woods and her husband [33-7 Tr. 8; 33-5 Tr. 11-12]. Before the events of this case, Ms. Woods and Mr. Minnick had a good relationship because he worked with her husband [33-5 Tr. 20]. But she says the relationship began changing immediately after she arrived to work at Keystone, when she says she "started getting disrespected consistently" [*id.*]. Mr. Minnick made comments to Ms. Woods like, "If you would let me touch you, I would" and "I'm going to be your first white boyfriend" [*id.* Tr. 27]. Ms. Woods treated the boyfriend comment as a joke "because you can't take everything seriously," but the comments didn't stop [*id.* Tr. 31].

On January 6, 2022, a foam bundle weighing about 325 pounds fell off a forklift and hit Ms. Woods [*id.* Tr. 35; 33-6 Tr. 25-26]. An ambulance took her to the hospital [33-5 Tr. 50; 33-8 ¶ 9]. Abigail Thomas, Keystone's workers' compensation specialist, asked Ms. Woods to report to Keystone the following day to complete an accident report [33-8 ¶ 2, 9]. Ms. Thomas made clear to Ms. Woods that Keystone wouldn't expect her to perform any work until she was medically cleared, and she told Ms. Woods she would have a follow-up appointment at Beacon (a local medical group and hospital) [*id.* ¶ 9]. Ms. Woods didn't complete the accident report on January 7, 2022, but she did attend the Beacon appointment, and she received clearance to return

---

[1] "Tarping" means "taking one rubber part" of an RV "and basically attaching it so that the tarp can hold down to the frame" to protect the frame [33-5 Tr. 11].

to work that day with restrictions [*id.* ¶ 10-11]. Beacon recommended that Ms. Woods ice her injury and included work restrictions: "[l]imit prolonged walking/standing," "[n]o safety sensitive duties," and "[n]o working at heights/climbing ladders" [*id.* ¶ 11].

On January 10, Ms. Woods had a follow-up appointment at Beacon for her neck strain and head injury, and Beacon continued her work restrictions but only included "[n]o safety sensitive duties" and "[n]o working at heights/climbing ladders" [33-10]. Ms. Woods returned to work, but she couldn't do her normal receiver job with the medical restrictions [33-5 Tr. 58]. Keystone's practice for employees with limitations was to place them on light duty tailored to an individual employee's needs [33-3 Tr. 59; 33-8 ¶ 4]. Light-duty assignments varied "based on the restrictions that need to be accommodated" but could include "all sorts of seated work, including shredding paper, completing paperwork, etc." [33-8 ¶ 5].

Ms. Thomas discussed these restrictions with Mr. Minnick, who confirmed that he would comply with the restrictions, and he also allowed Ms. Woods to take breaks as needed while still receiving full pay [*id.* ¶ 12]. Ms. Woods' first light-duty job was unwrapping glass, a typical light-duty assignment because, as Mr. Minnick explained, "there's no weight to it, there's no danger to it" [33-6 Tr. 29-31]. Ms. Woods testified that this job still required physical labor, including bending, tearing, and ripping paper before folding it [33-5 Tr. 151].

From Monday, January 17 through Thursday, January 20, Ms. Woods did not come in to work [33-8 ¶ 15]. These weren't excused absences because Beacon had not classified Ms. Woods as "off work" [*id.*], but Ms. Woods texted Mr. Minnick on Monday to let him know, and he responded, "No prob" and told her to get well "darling" [33-20 at 6]. Ms. Woods testified that

3

"in the beginning," she "just thought that was kind of like something that older people say to young people," and she referred to his use of darling as "his lingo" [33-5 Tr. 41].

That Wednesday, she texted him that she would have to get further testing because she was still in pain, and he responded, "Ya but you are still beautiful" and told her to let him know if he could do anything [33-20 at 2]. This text, she said, made her feel uncomfortable because she didn't understand what her injury had to do with her appearance, and his comments had started to get "redundant" [33-5 Tr. 37]. Still, she texted him that she "really appreciate[d]" his concern for her, and he replied, "I want you back to your incredible self" [33-20 at 1]. Ms. Woods responded, "thank you" with a smiling emoji [*id.*]. She testified that this exchange didn't bother her because she "just thought he was just being genuine" [33-5 Tr. 36].

Ms. Woods testified that she "didn't really say a whole lot" to Mr. Minnick about the comments beyond things like "[t]hat's inappropriate" or "Chad [her husband] wouldn't like for you to say things like that" [*id.* Tr. 37]. She didn't want to jeopardize her job, her husband's job, or her son's job (who also worked there) at Keystone because she confronted Mr. Minnick or went to human resources [*id.*].

On Thursday (January 20), Ms. Woods had another follow-up appointment at Beacon, and Beacon updated her work restrictions to "limit lifting, pushing, pulling < 25 lbs" [33-11]. Ms. Woods refused to sign the document with the new restrictions because she was upset and disagreed with the changes [*id.*; 33-5 Tr. 66]. Ms. Thomas called Ms. Woods later that day, and Ms. Woods explained that she didn't trust Beacon and thought they had "misdiagnosed her" [33-8 ¶ 17]. Ms. Woods also told Ms. Thomas that light duty was "a joke"—the only time she complained to Ms. Thomas about the light-duty job assignments [*id.*]. Ms. Thomas told her to

4

reach out in the event her light-duty assignments were causing increased pain or discomfort [*id.*]. Ms. Thomas also explained to Ms. Woods that her absences weren't approved through workers' compensation, so she had accumulated six absences, and Ms. Thomas reminded her of Keystone's attendance policy [*id.* ¶ 18].[2] Ms. Woods never requested medical leave from Ms. Thomas [*id.* ¶ 19].

Because Ms. Woods had not been happy with Beacon, Ms. Thomas recommended her for specialist treatment at Orthopedic & Sports Medicine Center (OSMC) [*id.* ¶ 22]. That was approved, and Ms. Woods had her first OSMC visit on January 24 [*id.* ¶ 22-23]. OSMC restricted her to "seated work only" and recommended that "[i]f no job is available with the above stated duties, consider 'off work'" [33-13 at 2]. Mr. Minnick began allowing her to work at his desk, doing things like gathering packing slips and recording them [33-6 Tr. 31-32]. He continued permitting her to take breaks in her car until human resources told him to stop [*id.* Tr. 37-38], and he allowed her to go home when she asked [33-5 Tr. 69].

In early February, Ms. Woods had another appointment at OSMC, and her restrictions stayed at "seated work only" with the suggestion that Keystone should consider "off work" if no seated work was available [33-14 at 3]. Ms. Woods expressed a desire to "do a little more activity at work because she [felt] frustrated by doing seated work only" [*id.*]. She testified that she had to say this so that she could avoid working at Mr. Minnick's desk; but, on this record, she never told anyone at Keystone this [33-5 Tr. 87]. Mr. Minnick's comments continued: "If you would let me touch you, I would" [*id.* Tr. 27]. On February 20, Ms. Woods texted him that she was at

---

[2] Ms. Woods seems to have interpreted this as a threat to her job [33-5 Tr. 74; 42-1 ¶ 33].

work, just sitting in her car until she didn't feel dizzy, and Mr. Minnick responded, "K baby" [33-20 at 3]. She felt that this was "[v]ery inappropriate" [33-5 Tr. 39].

At an appointment on February 28, OSMC changed Ms. Woods' restrictions to "[n]o lifting over 30 pounds/no ladders/no repetitive pushing or pulling" and noted that she was "progressing with therapy" and would "continue light duties" [33-15 at 4-5]. She began riding in a golf cart at Keystone to assist the parts counter [33-19 at 3]. During this time, Mr. Minnick asked her, "How does it feel to ride with your boss?" [33-5 Tr. 27]. Ms. Woods testified she just "stayed quiet" [*id.* Tr. 32]. Another time, he saw her using a massager and said, "Oh, so that's how you like it? You like it nice and hard" [*id.* Tr. 27]. Ms. Woods said she just responded to this by saying "[e]nough" and walked away [*id.* Tr. 43]. She vented to a few coworkers, but she didn't report any of the comments to human resources because she didn't trust the department after it "tried to put [her] back to work after a horrible accident" [*id.* Tr. 33]. She told her husband, and she thought he would say something to someone, but he didn't [*id.* Tr. 43].

In late March, OSMC switched Ms. Woods back to "seated work only" after she pushed herself too hard [33-16 at 3; 33-5 Tr. 96]. Keystone then assigned her to shredding paper, which she found loud, annoying, bright, and "extremely uncomfortable" [33-5 Tr. 88]. She did that for a couple of weeks and continued to take breaks in her car [*id.* Tr. 92, 100].

On April 6, OSMC lightened her restrictions to "[n]o lifting over 30 pounds/no ladders/no repetitive pushing or pulling stand/[w]alk for 1-2 hours at a time followed by 30 minutes of seated work" [33-17 at 5]. This update was sent to Keystone [33-8 ¶ 29]. On April 12, Keystone received a complaint from Ms. Woods' lawyer that "Keystone is not complying completely with her restriction of sit down work only" because Ms. Woods was "being told to

6

bend, twist, lift, push, pull, etc." [33-22 at 1]. There was no mention of any sexual harassment. Ms. Thomas confirmed that Ms. Woods was no longer assigned to seated work only and noted that she was still performing seated tasks and other duties when she felt good enough, and she personally went to the plant to "confirm that Ms. Woods was not performing any tasks that included bending, twisting, lifting, pushing, or pulling" and that Keystone was complying with her restrictions [33-8 ¶ 30]. Mr. Minnick recalls "reprimanding her for exceeding her light duty" because Ms. Woods was doing more than she should have; he had to explain to her that she couldn't exceed the restrictions even when she felt good [33-6 Tr. 43].

During this time, Keystone never reduced Ms. Woods' pay, and she accumulated fifteen attendance occurrences without any discipline [33-5 Tr. 112; 33-8 ¶ 18].[3] On May 11, OSMC released Ms. Woods back to work for regular duties [33-18 at 3]. She didn't agree with this because she was "still going through a whole lot of pain," and she expressed to Mr. Minnick that she wanted a second opinion [33-5 Tr. 106, 110]. She doesn't remember talking with anyone else at Keystone about needing additional accommodations [*id.* Tr. 107].

On May 13, Ms. Woods complained to Mr. Minnick about her pain, and he responded that he thought it was all in her head [*id.* Tr. 105]. Ms. Woods then took a break in her car and was on the phone with her lawyer when she saw Mr. Minnick staring at her [*id.* Tr. 113-14]. Mr. Minnick pulled up next to her, and Ms. Woods testified that, "that's when I kind of [went] off on him" [*id.* Tr. 115]. She told him she was frustrated with the lack of concern for her accident and that he should be ashamed because they were both married [*id.* Tr. 115-16]. She doesn't remember saying, "I quit," but she told him he had been sexually harassing her and said that she couldn't

---

[3] Generally, seven absences within a year would result in a Keystone employee's termination [33-4 at 8].

take it anymore [*id.* Tr. 116]. Mr. Minnick denied the harassment, and he allowed Ms. Woods' husband to take her home [*id.* Tr. 116-17].

Mr. Minnick went to human resources and reported that Ms. Woods was quitting and the reasons she had given him [33-6 Tr. 50-52]. He told Christine Conrad, the human resources manager, that Ms. Woods had quit and that she had said that he was sexually harassing her [33-25 at 1]. That same day, after her departure, Ms. Woods' husband texted Mr. Minnick, "Marshall…. after talking to the wife, she realizes she allowed the decision of the doctor to overwhelm her…along with all her pain and stress and she moved to[o] quickly and called it quits…. please allow her to keep working…. she's not doing the best right now but wants to remain on the team if that's ok with you" [33-24 at 1 (ellipses original)]. Mr. Minnick responded that he was sorry, but human resources had already terminated her [*id.* 2].

The human resources manager investigated the sexual harassment allegations after Mr. Minnick reported them [33-25; 33-1 ¶ 7]. She contacted Ms. Woods, but, after failing to reach any witnesses, she wasn't able to confirm that Mr. Minnick engaged in sexual harassment in violation of Keystone's policy [33-1 ¶ 7, 9]. She met with Mr. Minnick to counsel him on his language and his use of the words "darling" and "baby" because she believed they were "inappropriate for the workplace" [*id.* ¶ 9-10]. Keystone's general counsel, who supervised the human resources manager, also met with Mr. Minnick to discuss the comments [*id.* ¶ 10].

The human resources manager reached out to Ms. Woods and told her that she was "going to let her quit stand" because "[s]he quit and that was it" [33-3 Tr. 90]. Ms. Woods was eligible to reapply [*id.*]. There were employees who had left voluntarily and been rehired, but Keystone typically makes former employees wait 60 days to reapply [*id.* Tr. 34-35]. The human resources

manager told Ms. Woods she could reapply, but Ms. Woods never did [33-5 Tr. 126]. She filed this lawsuit, alleging that Keystone subjected her to a sexually hostile work environment in violation of Title VII and failed to accommodate her medical needs under the ADA.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A. *Title VII.*

Title VII prohibits a qualifying employer from "discriminat[ing] against any individual… because of such individual's. . . sex." 42 U.S.C. § 2000e-2(a)(1). This protection shields employees from sex-based harassment. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79-80 (1998); *accord Brooks v. City of Pekin*, 95 F.4th 533, 540 (7th Cir. 2024). To succeed on a hostile work environment claim based on sexual harassment, a plaintiff must show that "(1) the work environment was objectively and subjectively offensive, (2) the harassment complained of was based on gender, (3) the conduct was either severe or pervasive, and (4) a basis for employer liability exists." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627 (7th Cir. 2019).

The court considers the evidence as a whole. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In doing so, for instance, the court examines "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). "Offhand comments, isolated incidents, and simple teasing" aren't sufficient. *Id.* at 840-41.

An employer can avoid liability if it "can show the hostile work environment was not accompanied by an adverse employment action and prove an affirmative defense," such as the *Faragher-Ellerth* defense, *Hunt*, 931 F.3d at 627-28, derived from *Faragher v. City of Boca Raton*, 524 U.S. 775, 805-06 (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). This defense "requires the employer [to] prove by a preponderance of the evidence that[] (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the

10

plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm." *Id.* at 628.

This defense doesn't apply when a "supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765. Similarly, it doesn't work if a harassing supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (quotations omitted). This class includes, as examples, "a president, owner, proprietor, partner, corporate officer, or supervisor holding a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer," but not "low level supervisors." *Id.*

Ms. Woods' sexual harassment claim is based solely on Mr. Minnick's conduct [33-5 Tr. 26]. Keystone argues that, even if the court found the harassment to be severe or pervasive, the *Faragher-Ellerth* defense applies because Keystone had an anti-harassment policy in place, Keystone acted reasonably in preventing the conduct, and Ms. Woods never gave Keystone the opportunity to correct the conduct until after she resigned. It adds that Mr. Minnick's conduct wasn't severe or pervasive enough to constitute sexual harassment under Title VII. The court addresses only the defense.

Ms. Woods argues that Keystone cannot assert the affirmative defense for two reasons. First, she says Mr. Minnick's harassment led to an adverse employment action. *Ellerth*, 524 U.S. at 765. A tangible employment action consists of something like "discharge, demotion, or undesirable reassignment." *Id.* It could also include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities,

11

or a decision causing a significant change in benefits." *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 853 (7th Cir. 2023). A "voluntary decision not to return to work…does not amount to a tangible employment action," and Ms. Woods left voluntarily. *Id.* When she later wanted to rethink her decision, Keystone "let the quit stand" [33-3 Tr. 90], and Ms. Woods speculates that this was Keystone taking the opportunity to "remove a difficult case," [42 at 12], but she offers this speculation without any proof or elaboration, and she never reapplied though Keystone made clear to her that she could. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion").

She hints at constructive discharge; but, even if she fully argued this, no reasonable jury could conclude that she was constructively discharged on this record. *See Hunt*, 931 F.3d at 628-29 (collecting cases). To establish constructive discharge, Ms. Woods must show "that the abusive working environment became so intolerable that…resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004); *accord Fugate v. Dolgencorp, LLC*, 555 F. Appx. 600, 605 (7th Cir. 2014) (quoting *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001)) (plaintiff must offer evidence of conditions "so intolerable that a reasonable person would have been compelled to resign"). She must show "working conditions even more egregious than that required for a hostile work environment claim." *Chapin v. Fort-Mohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).

Ms. Woods provides evidence of inappropriate sexual comments, but she hasn't alleged that she was touched, threatened, or "concerned for her safety at any point." *Hunt*, 931 F.3d at 629; *see also Myers v. Sunman-Dearborn Cmty. Schs.*, 2025 U.S. App. LEXIS 16195, 13-14 (7th Cir.

July 1, 2025) (conditions must be "objectively intolerable"). Nor has she provided evidence of a pervasively hostile environment to establish constructive discharge. *See Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225-26 (7th Cir. 2022) (age-based insults for nearly a year, vulgar graffiti, and interference with employee's workspace that had physical effects on employee sufficed under ADEA). The eight comments and associated conduct she alleges, some of which she testified she took as jokes, don't together justify a constructive discharge, particularly when the law typically contemplates that a worker remain on the job and utilize appropriate means to alert the employer to the issue. *See Wright v. Ill. Dep't of Children & Fam. Servs.*, 798 F.3d 513, 529 (7th Cir. 2015). No reasonable jury could find constructive discharge here, thus leaving no adverse employment action on this record.

Second, Ms. Woods says Mr. Minnick was a harassing supervisor "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Johnson*, 218 F.3d at 730. Vicarious liability would attach if Mr. Minnick could be considered Keystone's proxy or alter-ego. *Id.* This generally requires a "high-level manager" whose actions speak for the organization, rather than a "low-level supervisor." *Id.* The exception applies for a "supervisor holding a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer." *Id.* (quotations omitted) (citing *Faragher*, 524 U.S. at 789-90).

The employee in *Johnson* argued that her harasser, who held the title Chief of Police, was such a supervisor, but that court found that he had "no less than two supervisors" and held that finding vicarious liability for his actions would leave "little or nothing" of the *Ellerth-Faragher* defense. *Id.* Although the employee reported to the supervisor, he couldn't change the terms and

conditions of her employment, and the organization had "systems in place to check the behavior of its low-level supervisors" like the harasser, including a policy "through which an employee could make a complaint without having to go through the offending supervisor." *Id.*

This mirrors Keystone's policy [33-4 at 7]. No one disputes that Mr. Minnick was Ms. Woods' supervisor, but Ms. Woods offers no evidence to support the idea that he spoke for Keystone or was high enough in management to be treated as Keystone's proxy. *Johnson*, 218 F.3d at 730. He might direct her work tasks day-to-day, but nothing shows he could change the terms and conditions of her employment, and even then he often followed the lead of those higher in the company's chain of command when it came to the nature and scope of her work. Because Ms. Woods hasn't adduced evidence for a reasonable jury to conclude that an adverse employment action occurred or that Mr. Minnick was acting as Keystone's proxy, the court turns to whether Keystone has established that the affirmative defense applies.

The first element of this defense requires an employer to show that it "exercised reasonable care to prevent sexually harassing behavior." *Trahanas*, 64 F.4th at 854. Though "not required as a matter of law, the existence of an appropriate anti-harassment policy will often satisfy this first prong." *Shaw v. Auto Zone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) (citations omitted); *see also Hunt*, 931 F.3d at 630 (comprehensive policy with robust options for reporting enough). Keystone had just such a policy in its employee handbook that provided that "[h]arassment based on sex is strictly prohibited" [33-4 at 6]. Under the policy, "unwelcome sexual advances, requests for sexual favors, other verbal and physical conduct, or electronic communications of a sexual nature" could violate the policy [*id.*]. The policy directed employees who believed they were being harassed to "advise the offender that his or her behavior is

14

offensive and request that it stop[] immediately" [*id*.]. Employees who weren't comfortable talking to the harasser or who had "done this and continue[d] to be subjected to the offensive behavior" were "required to report the behavior promptly to their immediate Supervisor, the Human Resources Department, or any other member of management" [*id.* 7]. The policy then provided for investigation by human resources and confidentiality to the extent possible [*id*.]. No reasonable jury could conclude that Keystone failed to exercise reasonable care.

The second element turns on whether Ms. Woods failed to use the corrective opportunities provided by the company. The court uses "a functional test that asks whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm." *Hunt*, 931 F.3d at 631 (quotations omitted). If a defendant demonstrates that an employee failed to use the reporting procedures, that "will normally suffice to satisfy the employer's burden." *Id.*

Keystone outlines a very clear procedure for reporting harassment, one Ms. Woods chose not to follow. She argues that this policy allowed her to confront the harasser, but she says "if the harasser chose not to stop, the harasser could essentially get away with continuing the harassment." That isn't really true under Keystone's policy. She complained to Mr. Minnick that his actions were inappropriate, and she says she feared retribution from Mr. Minnick, who she says could stop corrective action by preying on her fear of retribution, not just against her, but her husband, who worked under Mr. Minnick too. But Ms. Woods ignored the policy's requirement that, if her report to Mr. Minnick didn't work or if she didn't feel comfortable confronting Mr. Minnick, she was required to go to human resources or anyone in management [33-4 at 7]. She didn't take advantage of the policy or remedies Keystone made available to her;

15

she chose not to go to human resources, even when the policy provided for confidentiality to the extent possible during the investigation [*id.*]. Notably, when she last complained and called his comments sexual harassment, even Mr. Minnick reported her complaint to higher-ups. A prompt investigation ensued, and both the human resources manager and general counsel spoke with Mr. Minnick about his comments. On this record, Keystone had a policy in place and Ms. Woods failed to act promptly to notify Keystone about the harassment, so there is no basis for employer liability. *Hunt*, 931 F.3d at 627-28. No reasonable jury could find otherwise. The court thus grants summary judgment for Keystone on Ms. Woods' sexual harassment claim.

    B. *Americans with Disabilities Act (ADA).*

The Americans with Disabilities Act exists to eliminate "discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It applies to qualified individuals "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Under the ADA, there are two types of discrimination claims: failure to accommodate and disparate treatment." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 n.4 (7th Cir. 2015). Ms. Woods brings a failure-to-accommodate claim, so she must show that she was a qualified individual with a disability, her employer was aware of her disability, and her employer failed to accommodate her disability reasonably. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). The parties don't dispute the first two prongs, only reasonable accommodation.

The law requires an employer make a reasonable effort to determine the appropriate accommodation. "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability."

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). The court looks for "signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Id.* A plaintiff who "fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.*

An employer has an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R.*, 975 F.3d 629, 638 (7th Cir. 2020). "The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Failing "to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). But "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). As an example of a shortcoming, the employer in *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061-62 (7th Cir. 2014), fired an employee upon learning of her condition and general request for an accommodation without speaking to her or her doctor. That said, "an employee who fails to uphold her end of the bargain—for example, by not clarifying the extent of her medical restrictions—cannot impose liability on the employer for its failure to provide a reasonable accommodation." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) (quotations omitted).

Keystone argues that this ADA claim fails because the company always complied with Ms. Woods' restrictions as outlined by medical providers and because Ms. Woods never requested any other accommodations. Ms. Woods argues that she complained to Mr. Minnick and Keystone's worker's compensation specialist. Without much more elaboration, she says Mr. Minnick assigned her to light work "seemingly at a whim" and Keystone threatened her job for requesting breaks and time off rather than engage in an interactive process.[4] The record doesn't support these general allegations. Mr. Minnick assigned her light work in accordance with her medical records. And Ms. Woods doesn't explain how Keystone threatened her job.

Ms. Woods doesn't identify any specific times in her brief where she voiced discontent. Mr. Minnick testified he remembered Ms. Woods complaining about her doctors and her medical treatment, but she didn't complain to him about job assignments making things worse [33-6 Tr. 71-72]. Keystone identifies two times Ms. Woods complained. First, right after her injury in January, she was assigned to unwrapping glass while on restrictions from Beacon [33-10; 33-6 Tr. 29-31]. Ms. Woods complained about Beacon and the restrictions, so Ms. Thomas referred her to OSMC for specialist evaluation [33-8 ¶ 22]. OSMC adjusted her to "seated work only" [33-13 at 2]. Before the adjustment, Ms. Woods called light duty a "joke," but Ms. Thomas says that was the only time she complained about job assignments, though Ms. Thomas told Ms. Woods to let her know if her assignments were increasing her pain or discomfort [33-8 ¶ 17]. Nothing about this process shows that Keystone wasn't trying to affirmatively work with Ms. Woods and

---

[4] Ms. Woods isn't specific in her brief, but this allegation of a threat seems to refer to Ms. Thomas informing Ms. Woods that she had accumulated a number of absences. No penalties were ever given for those absences, and Ms. Woods continued to be allowed to take breaks. Essentially, nothing ever came of the perceived threat. *See Boss v. Catros*, 816 F.3d 910, 919 (7th Cir. 2016) ("[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences," aren't materially adverse).

18

accommodate her needs. Ms. Thomas referred Ms. Woods to a new medical provider when she wasn't satisfied, and the company continued her full pay while assigning her to seated work. Keystone continued to modify her work as her restrictions evolved.

The second instance when Ms. Woods alerted Keystone that it wasn't accommodating her came in April, when her lawyer reached out to complain that Keystone wasn't complying with her restriction of "sit down work only" [33-22 at 1]. But at that time, OSMC had taken Ms. Woods off the seated only work restriction [33-17 at 5]. She was still performing light work duties, and Keystone wasn't requesting anything more of her [33-8 ¶ 30]. Ms. Thomas confirmed these things. Ms. Woods admitted she chose to perform other tasks when she felt good enough, and she often decided what to do [33-5 Tr. 101-02]. No reasonable jury could find that Keystone wasn't complying with her restrictions or that Keystone "turn[ed] a blind eye" to her restrictions and condition. *Spurling*, 739 F.3d at 1061.

Finally, Keystone notes that Ms. Woods never asked for an additional accommodation. That's true on this record. Keystone had a legal obligation to engage in an interactive process, but Ms. Woods likewise had an obligation to "make reasonable efforts to help the other party determine what specific accommodations [were] necessary." *Beck*, 75 F.3d at 1135. Keystone complied with Ms. Woods' documented medical restrictions, referred her to a new medical provider when she didn't trust Beacon, allowed her to take breaks, regularly confirmed her work fell in line with restrictions (and even counseled her to do so), and never reduced her pay or refused an accommodation she requested. Keystone worked "in accordance with its understanding of the disability." *Id.* at 1137. No reasonable jury could conclude otherwise. The court grants summary judgment for Keystone on Ms. Woods' failure to accommodate claim.

## CONCLUSION

Accordingly, the court grants Keystone's summary judgment motion [32] and directs entry of judgment for the company. This order terminates the case.

SO ORDERED.

July 7, 2025                                         s/ *Damon R. Leichty*
                                                     Judge, United States District Court